Ling-Cohan, J.
(dissenting). I respectfully dissent and vote to reverse, as landlord failed to establish that tenant breached the terms of the parties’ settlement stipulation. As recently stated by this court, “[s]trict enforcement of the parties’ stipulation ... is warranted [here] based upon the principle that the parties to a civil dispute are free to chart their own litigation course” (Trio 90 LLC v Williamson, 53 Misc 3d 149[A], 2016 NY Slip Op 51647[U], *1 [App Term, 1st Dept 2016], citing Mill Rock Plaza Assoc. v Lively, 224 AD2d 301 [1996]).
The stipulation at issue provides, in pertinent part:
“Without admitting the allegations contained in the Termination Notice . . . [tenant] agrees to refrain from all conduct specified therein . . . This includes refraining from maintaining the subject premises in an unsanitary and unsafe manner by storing, *66 collecting, and cramming from floor to ceiling papers, magazines, newspapers, garbage, trash, boxes, bags, furniture, clothing, and other items; refraining from maintaining the hallway directly outside his unit in such a manner; and refraining from any other conduct listed in the Termination Notice” (emphasis added).
The type of nuisance complained of by landlord, as contained in the termination notice and incorporated into the stipulation, was very specific and is described in the termination notice as follows:
“knowingly and intentionally permitting] and maintaining] the premises involved in an unsanitary and unsafe manner by storing, collecting and cramming from floor to ceiling papers, magazines, newspapers, garbage, trash, boxes, bags, furniture, clothing and other items throughout the premises involved, as well as in the hallway directly outside the premises involved; your maintenance of the premises involved as aforesaid has created and continues to create a condition that poses a health and fire hazard to the other tenants in the building and violates applicable sections of the Housing Maintenance Code . . . your maintenance of the premises involved as aforesaid has created, and continues to create, a condition that poses a fire and safety hazard to your neighbors, as well as the employees, contractors and agents of the landlord/ owner in that the premises involved is a fire trap and egress is not readily accessible” (emphasis added).
Thus, both the stipulation and the termination notice make clear that “storing, collecting and cramming” items, by itself, is not enough to constitute a breach under the terms of the stipulation and termination notice; rather, such storing, collecting and cramming must be “knowingly and intentionally,” “unsanitary and unsafe,” and “from floor to ceiling,” “throughout the premises,” “as well as in the hallway directly outside the premises,” and must create a condition which “poses a health and fire hazard to the other tenants,” “violates . . . the Housing Maintenance Code” and “poses a fire and safety hazard to . . . neighbors . . . employees . . . and agents of. . . landlord . . . in that the premises involved is a fire trap and egress is not readily accessible.” Therefore, even if the evidence at the *67 hearing did in fact show that the condition of the subject premises was, arguably, in a “nuisance condition, depicting an undue accumulation of items such as boxes and garbage bags,” as the Civil Court determined and the majority has pointed out, nevertheless, such would not constitute a breach of the stipulation, as there was no finding that such accumulation was also, inter alia, “unsanitary and unsafe” and “from floor to ceiling,” as carefully negotiated by counsel and explicitly required by the parties’ stipulation.
Notably, the words “unsanitary and unsafe” and “from floor to ceiling” were copied precisely, word for word, from the termination notice (that landlord drafted) and duplicated into the two attorney stipulation, when such words could have been deleted and, instead, it could have indicated that any mere accumulation of items or “clutter” constituted a breach of the stipulation. The fact that these words were precisely copied into the stipulation indicates that the parties “chart [ed] their own litigation course” (Mill Rock Plaza Assoc. v Lively, 224 AD2d 301, 301 [1st Dept 1996]), and agreed that, before tenant could be evicted, landlord had to prove, inter alia, that, any alleged accumulation was from “floor to ceiling” and “unsanitary and unsafe.” Not only were these words copied precisely into the stipulation, but the parties explicitly incorporated the termination notice into the stipulation of settlement, further underscoring that mere accumulation not rising to a height of “floor to ceiling” (a term of measurement specifically used in both the stipulation and notice of termination) was insufficient to constitute a breach.
In fact, under the termination notice (incorporated into the stipulation), it is only when tenant “maintain[s] . . . the premises as aforesaid,’[1] may it even be considered to qualify as “a condition that poses a health and fire hazard to the other tenants in the building and violates applicable sections of the Housing Maintenance Code,” and “a condition that poses a fire and safety hazard to . . . neighbors, as well as the employees, contractors and agents of the landlord/owner” (termination notice, record at 15).
*68 Stipulations of settlement are contracts subject to principles of contract construction (see Hotel Cameron, Inc. v Purcell, 35 AD3d 153, 155 [1st Dept 2006]), including the tenets that contractual provisions should be given their plain and ordinary meaning (see Rosalie Estates v Colonia Ins. Co., 227 AD2d 335, 336 [1st Dept 1996]) and that a court should avoid any interpretation that effectively renders meaningless a part of the agreement (see Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc., 63 NY2d 396, 403 [1984]). Where the language of a contract is clear and unambiguous, the parties’ intent may not be considered (see Greenfield v Philles Records, 98 NY2d 562, 569-570 [2002] [“if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity”]; W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990] [“(e)vidence outside the four corners of (a) document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing”]).
Applying these principles, since the language of the stipulation is clear and unambiguous, it was improper for the majority and the trial court to look to the “aim” and “point” of the parties’ stipulation; to do so ignores the plain meaning and renders meaningless the precise language (“unsanitary and unsafe” and “from floor to ceiling”) explicitly duplicated and incorporated by the parties from the termination notice into the lengthy and carefully negotiated two attorney stipulation (see Greenfield v Philles Records, 98 NY2d at 569; Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc., 63 NY2d at 403). In fact, at no point does the majority even discuss the carefully duplicated terms (“unsanitary and unsafe” or “from floor to ceiling”) found in both the stipulation and the incorporated termination notice, instead supplanting such plain language with its own crafted “aim” of the stipulation, thereby improperly altering “the contract to reflect its personal notions of fairness and equity” (Greenfield v Philles Records, 98 NY2d at 569-570).
Viewed within the appropriate contractual interpretation framework, and as specified by the precise, plain language of the stipulation and the termination notice which, as indicated, was incorporated by the parties into such stipulation, the proof adduced by landlord at the compliance hearing was woefully insufficient to support a finding that tenant should be evicted because he breached the stipulation. Notably, there was no proof, testimony, nor finding by the hearing judge, as to any al *69 leged “unsanitary or unsafe” condition throughout the subject apartment, nor in the hallway outside of respondent’s premises. Nor was there a finding, or any evidence adduced, that (1) there was a “floor to ceiling” accumulation in the apartment, or that (2) the “aforesaid conditions” (namely the “floor to ceiling” accumulation of the enumerated items in the stipulation/notice) caused an “unsanitary and unsafe” condition creating a “health and fire hazard to other tenants,” a specific violation of “the Housing Maintenance Code,” and any “fire and safety hazard,” required for a breach under the plain language of the stipulation.
Ironically, the only mention at the hearing as to any Housing Maintenance Code violations was against landlord, and not tenant So.[2] Yet, it is tenant So, with no violations placed on his apartment, or any evidence that his conduct created “a condition that poses a health and fire safety hazard and violates applicable sections of the Housing Maintenance Code” and is “a fire and safety hazard,” who is being evicted from his home of 38 years. In fact, the Hearing Judge took judicial notice of New York City’s Housing Preservation and Development website, which listed eight “C” violations for immediately hazardous conditions required to be corrected within 24 hours and 16 “B” violations for hazardous conditions required to be fixed within 30 days issued against the building/landlord, and noted that there were no recorded violations for So’s individual apartment.[3] Nor was there any proof or testimony at the hearing of fire department reports showing any fire safety violations in So’s apartment, or any mention of other tenants in the building who may have complained about So’s use of his apartment inhibiting, inconveniencing, or harassing them, as required.
Moreover, although certain photographs admitted into evidence could arguably support a finding that there was “accumulation” of possessions in So’s unit on the second inspection date,[4] nevertheless, as indicated, landlord failed to make the necessary threshold showing (and the hearing court made no factual finding) that the premises were “unsanitary and *70 unsafe,” with items “from floor to ceiling,” much less that if such “floor to ceiling” condition did in fact exist, that such condition created “a health and fire hazard to the other tenants” and violated “the Housing Maintenance Code,” as required by the specific language of the stipulation and notice of termination. Landlord offered neither documents, nor testimony from any fire safety, health or other agency official, indicating that the conditions in the room were violative of the above-quoted provisions. In fact, there was a complete absence of evidence regarding health and safety from landlord’s sole witness, a mere process server, employed by landlord’s attorneys. Furthermore, petitioner’s single witness merely testified that he had been in the subject apartment on only one occasion, the day of the second inspection, and then admitted that tenant’s belongings did not pile up “from floor to ceiling,” but, rather, only some of tenant’s property was piled six feet in height, off of the floor—plainly not a breach under the express terms of the stipulation. Landlord also did not even allege, nor show, that there was any condition in the “hallway directly outside” tenant’s unit required to constitute a breach of the parties’ stipulation.
In addition, tenant submitted his own photographs at the hearing showing that, after the stipulated second inspection, his unit was in a substantially improved condition. The hearing court failed, however, to make any factual finding as to whether the alleged condition had been cured by tenant, based upon the misconception that it could not consider any potential cure (even though such cure took place prior to the hearing and the issuance of any warrant), due to the lack of a cross motion by tenant with respect to such issue. This was obvious error, since the issue of cure was raised at the hearing and also asserted in tenant’s answer. Thus, undisputed evidence regarding the remedial action that tenant took after landlord’s second inspection was clearly relevant and should have been considered by the trial judge (see Gazivoda v Sherman, 29 AD3d 458, 459 [1st Dept 2006]), despite the lack of a cross motion.
Moreover, contrary to the majority’s view, the terms of the stipulation did not preclude tenant from curing any alleged condition after an inspection, but prior to the court’s hearing. In fact, the parties’ stipulation is silent on the issue of cure and merely provides language that there would be “no further stays” after a warrant of eviction had issued, but does not provide that a cure was not to be permitted, prior to that time *71 (cf. Sacchetti v Rosen, 2001 NY Slip Op 40306 [U], *2 [App Term, 1st Dept 2001] [court held tenant represented by counsel and guardian ad litem had no right to cure nuisance where stipulation included specific language waiving “any and all rights to . . . cure any breaches of. . . agreement”]).
Further, to the extent that tenant’s remedial action may have been considered untimely, the unrefuted hearing evidence supports a finding that any alleged breach was not “knowingly or intentionally” caused by tenant, and that any “nuisance condition” was in fact, caused by landlord’s own breach of the parties’ stipulation. Significantly, paragraph 11 of the stipulation expressly provides that landlord “shall take no steps designed to prohibit [tenant] from curing or maintaining cured nuisance conditions.” At the hearing, however, tenant testified, without contradiction, that after the first inspection, landlord deprived tenant of certain basement storage space that tenant had used for many years, forcing tenant to place the stored items into his unit temporarily (which he later removed after the second inspection). If indeed, there was no choice but to force tenant to remove his possessions from the basement, due to landlord’s construction converting the “rooming house units” (such as tenant So’s) “into apartment units,” landlord should have called Adult Protective Services (which had been involved in the initial organizing of the apartment), or tenant’s attorney, to assist tenant in relocating such possessions, rather than summarily requiring their removal, forcing tenant to place such possessions in his 400-square-foot single room, with no closets for storage.
In addition, tenant’s unrebutted testimony showed that his ceiling was damaged as a result of construction and water flooding into tenant’s room from the unit directly above, and, therefore, tenant was forced to move his belongings around and place large plastic bags over them, to protect them from construction dust and water damage. Thus, it was not disputed that, after the first inspection, events beyond tenant’s control, to wit landlord’s own actions, prevented tenant from “curing or maintaining [the] cured nuisance conditions,” and such was in clear violation of the parties’ stipulation. Consequently, any “delay” by tenant to remedy or maintain any alleged condition was excusable.
Landlord further violated the parties’ stipulation and, thus, failed to make a prima facie showing of tenant’s breach because *72 no evidence was supplied showing that landlord videotaped the subject premises, despite clear and specific language in the stipulation requiring that the subject premises be both “photographed and videotaped” (emphasis supplied), at the agreed upon inspections, during tenant’s 10-month probationary period, “to further eliminate any misunderstanding between the parties,” and “courtesy copies of [such] photographs and videotapes” were required to have been supplied to tenant’s attorney, prior to any hearing. Moreover, unlike continuous video, the photographic evidence produced by landlord at the heáring consisted merely of isolated close-ups of tenant’s possessions on his bed and furnishings, and were not full panoramic views of tenant’s single room.[5] Further, the photographic evidence,[6] indisputably, did not show the required piling of possessions from “floor to ceiling,” as was specified in the termination notice and incorporated into the parties’ stipulation, in order to constitute a breach. In fact, landlord’s own photographs supported its sole witness’ admission that tenant’s possessions were not piled “from floor to ceiling,” as required by the stipulation for a breach to have occurred.
Moreover, any alleged breach by tenant was de minimis, given that the first inspection was not an issue (and, therefore, presumably, plaintiff was in compliance with the parties’ stipulation during the first six months of the one-year probationary period), tenant cooperated with APS with the initial organization of his unit, and provided proof that he in fact remedied any clutter condition, quickly after the second inspection. Any breach was particularly de minimis, especially when weighed against landlord’s eight immediately hazardous violations and 16 hazardous violations placed on the building and landlord’s own actions causing any alleged breach by tenant, because of its construction, which indisputably caused flooding and dust to accumulate in So’s unit, and landlord’s requiring the immediate removal of tenant’s possessions from his long-term storage area in the basement, causing tenant to temporarily store some additional possessions in his unit just prior to the second inspection, and for which, tenant, nonetheless, *73 received no building violations on his apartment, unlike landlord’s 24 immediately hazardous/hazardous building violations.
In any event, even if it was determined that tenant breached the stipulation, as this court recently acknowledged, pursuant to RPAPL 753 (4),[7] tenant must be afforded a postjudgment opportunity to cure (see Roger Morris Apt. Corp. v Varela, 53 Misc 3d 151[A], 2016 NY Slip Op 51697[U] [App Term, 1st Dept 2016], citing Cutler v North Shore Towers Assoc., 125 AD2d 532 [1st Dept 1986]), and/or the lower court should have, at the very least, considered tenant’s evidence, which showed that he had in fact cured any alleged aggravated conditions, which were caused by landlord’s actions, prior to the hearing. Such statute, which provides for the automatic granting of “a ten day stay of issuance of the warrant, during which time the respondent may correct such breach” was enacted to “permit tenants to remain in possession by curing [a] violation after the rights of the parties have been adjudicated” (Post v 120 E. End Ave. Corp., 62 NY2d 19, 27 [1984]). Significantly, “[RPAPL 753 (4)] is procedural and remedial in nature and [is to] be liberally construed to spread its beneficial effects as widely as possible” (id. at 24; see also Lincoln Terrace Assocs. v Snow, NYLJ, Nov. 28, 1983, at 5, col 3, 1983 NY Misc LEXIS 4233, *2 [App Term, 1st Dept 1983] [“(RPAPL 753 [4]), remedial in nature, should be broadly applied wherever possible to avoid needless and unwarranted forfeitures of dwelling space(s)”]). Indeed, RPAPL 753 (4) has been applied where, as here, there has been a nuisance adjudication based on excessive clutter (see 4G Realty v Vitulli, 2 Misc 3d 29 [App Term, 2d Dept, 2d & 11th Jud Dists 2003]).
An opportunity to cure is particularly warranted in this case, given tenant’s age (65 years old), his long-term (38 years) rent-stabilized tenancy, the de minimis nature of the alleged breach, his efforts at mitigating any alleged condition prior to the hear *74 ing, and the undisputed need for and prior involvement of APS[8] (see Trump Vil. Section 3, Inc. v Birnbaum, 2002 NY Slip Op 50646[U] [App Term, 2d Dept, 2d & 11th Jud Dists 2002] [where tenant failed to timely comply with the terms of settlement by curing cluttered condition, execution of warrant was permanently stayed since proof established that tenant cured the cluttered condition, prior to entry of the final judgment]). The evidence produced at the hearing falls short of establishing a breach of the stipulation sufficient to warrant a forfeiture of this 38-year rent-stabilized tenancy. “It is a well-settled principle of equity that courts do not look favorably upon the forfeiture of leases” (2246 Holding Corp. v Nolasco, 52 AD3d 377, 378 [1st Dept 2008] [citations omitted]; see also Dino Realty Corp. v Khan, 46 Misc 3d 71, 72 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2014] [stating that “(t)he law abhors the forfeiture of leases” and that “it is the policy of (New York State) to prevent unnecessary evictions, particularly of rent-stabilized tenants” (citations omitted)]).
Accordingly, I would reverse, or, at minimum, remand for consideration of whether landlord caused the alleged breach by depriving tenant of the basement storage space and/or by landlord’s construction causing dust and flooding of tenant’s apartment,[9] and whether tenant cured any alleged condition, prior to the hearing, and/or, nevertheless, qualified for a stay, pursuant to RPAPL 753 (4).
Lowe, III, P.J., and Schoenfeld, J., concur; Ling-Cohan, J., dissents in a separate opinion.

. “Aforesaid,” as used in the termination notice, refers to “knowingly and intentionally . . . maintain[ing] the [subject] premises . . . in an unsanitary and unsafe manner by storing, collecting and cramming from floor to ceiling papers, magazines, newspapers, garbage, trash, boxes, bags, furniture, clothing and other items throughout the premises ... as well as in the hallway directly outside the premises.”

. The undisputed testimony was that landlord was replacing the “rooming house units,” such as tenant So’s, “into apartment units” and, thus, construction was being conducted in the building.

. Administrative Code of City of NY § 27-2115.

. Apparently, tenant passed the first inspection date provided for in the stipulation, as it was not an issue; nor is there a claim that tenant did not cooperate with Adult Protective Services (APS) when it came to organize his apartment.

. Clearly, videotape evidence would have shown a more comprehensive and panoramic view.

. It is noted that while the photographic evidence did not depict a “Better Homes and Gardens” model apartment, tenant lived in a one room “SRO,” with no closets and minimal furniture, such as a freestanding closet or wardrobe (given his limited means), which could have stored his possessions (characterized by landlord as “clutter”) from plain sight.

. RPAPL 753 is titled “[s]tay where tenant holds over in premises occupied for dwelling purposes in city of New York” and provides in relevant part, as follows: “4. [i]n the event that such proceeding is based upon a claim that the tenant or lessee has breached a provision of the lease, the court shall grant a ten day stay of issuance of the warrant, during which time the respondent may correct such breach.”
Here, the within proceeding was based upon breach of a provision of the lease, as well as “nuisance,” with the term “nuisance” defined precisely by the termination notice (and later the stipulation) as, inter alia, an “unsanitary and unsafe,” “floor to ceiling” accumulation.

. Adult Protective Services was involved in the initial organizing of tenant’s apartment six months earlier and appears to have failed to continue to monitor the subject premises. Thus, instead of evicting tenant, APS could have simply been notified to further assist tenant, particularly when landlord caused any alleged change in the condition of tenant’s apartment by, during the pendency of the proceeding, engaging in construction which actually caused tenant to take precautions by, inter alia, moving around his possessions to avoid damage, and requiring tenant to remove his possessions from his basement storage space just prior to the second inspection, which tenant relocated temporarily to his one room, which lacked closets or storage furnishings.

. It is undisputed that landlord caused flooding and an accumulation of construction dust in tenant So’s apartment and So was also deprived by landlord of his long-term basement storage unit, forcing him to move and pile his possessions in his single, 400-square-foot room.